# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### OWENSBORO DIVISION

CIVIL ACTION NO. 4:10CV-11-JHM

NANCY J. MCCARTY, individually,
and as Personal Representative of the Estate
of DAVID W. MCCARTY, Deceased                                    PLAINTIFFS

And

LIBERTY MUTUAL AGENCY MARKETS                    INTERVENING PLAINTIFF

VS.

COVOL FUELS NO. 2, LLC                                              DEFENDANT


## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Covol Fuels No. 2's ("Covol") Motion for

Summary Judgment [DN 120] and Motion to Exclude, or Limit Testimony of, Plaintiff's Expert

Witnesses [DN 122].  Additionally, other matters before the Court are Plaintiffs' Motion for

Partial Summary Judgment [DN 113], *Daubert* Motion to Exclude Testimony and Opinions of

Dr. George R. Nichols [DN 115], Motion *In Limine* Excluding Any Reference at Trial to David

McCarty's Alleged Marijuana Use [DN 116], and Motion for Sanctions is [DN 114].


## I.  BACKGROUND

On February 26, 2009, David McCarty, employed by Evansville Garage Doors, fell and

suffered fatal injuries while installing an overhead commercial-grade door at the Minuteman

Fines Recovery Plant located in Muhlenberg County.  Covol hired H & B Builders to construct

the post-frame building at the facility, and to complete this building, H & B Builders subcontracted the installation of the garage door to Evansville Garage Doors.

On the day of the fall, McCarty and Jeremy Means were sent to Covol's facility to install the garage door, but McCarty was the lead installer for the project. The incident that led to McCarty's death occurred while McCarty and Means were checking the tension spring in the door. Means and McCarty bolted the door to the tension wheel and used a forklift to raise the door to the height needed and to keep the door from falling while they were working. After bolting the door on the tension wheel, Means and McCarty decided that they no longer needed the forklift to restrain the door. To make the adjustments to the tension wheel, Means used a man-lift to put himself in position and McCarty positioned himself on the top of a ladder directly below the opening of the door. While checking the tension in the door, McCarty and Means pulled down on the garage door, which caused the door to fully descend and strike the ladder McCarty was using. Even though McCarty was wearing a safety harness and had tie-offs, he was not tied-off to anything that would have prevented his fall. As a result, McCarty fell from the ladder and hit his head against the concrete floor below him.

Following the incident at Covol, William Barnwell, a Mine Safety and Health Coal Mine Inspector, conducted an investigation into how McCarty fell from the ladder. Barnwell concluded that McCarty's fall resulted from the placement of his ladder directly below the door opening, the failure of Means and McCarty to follow the installation instructions for the door, and the lack of restraint devices used to prevent the door from descending as it did when it struck the ladder. However, "the root" cause of the incident, Barnwell reported, was that "[t]he steel curtain was not blocked from motion during the installation of the door as required in the manufacturer's installation manual." (MSHA's Report, DN 51-1, at 12). Additionally, the

inspector found the garage door itself free of any defects that would have contributed to the accident.

## II.  STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  Anderson, 477 U.S. at 252.  It is against this standard the Court reviews the following facts.

### III. DISCUSSION

In this case, Plaintiffs assert four theories of negligence: (1) common law duty "to provide a safe workplace and safe equipment," (2) "negligence *per se* for violating mine safety statutes and regulations," (3) voluntary assumption of a duty for McCarty based on "Covol's safety policies and procedures," (4) contractual duty of care "pursuant to the contract that Covol entered into with the Commonwealth of Kentucky." (Mem. in Supp. of Pls.' Mot. for Partial Summ. J., DN 113-1, at 1-2). Defendant responds to each contention by asserting that it either owed a very limited duty of care to McCarty, in the case of the common law duty, or that it owed no contractual duty arising from the lease with the Commonwealth of Kentucky, its internal policies, or mining regulations. Additionally, Defendant argues for immunity claiming the Workers' Compensation Act is Plaintiffs' exclusive remedy. Since a finding that the Workers' Compensation Act applies to Defendant would dispose of Plaintiffs' tort claims, the Court will first examine this assertion.

### A. Exclusive Remedy Under Workers' Compensation Act

Defendant argues that it is immune from tort liability because the Workers' Compensation Act provides the exclusive remedy in this case. Defendant supports this contention on what it perceives as Plaintiffs' admission within their motion for partial summary judgment. In response to this argument, Plaintiff points to Defendant's various filings to show issues of fact as to the applicability of the Workers' Compensation Act.

KRS § 342.690(1) provides that if an employer secures payment of workers' compensation under Chapter 342, "the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer . . . ." For purposes of this section, "the term 'employer' shall include a 'contractor' covered by subsection (2) of KRS 342.610,

whether or not the subcontractor has in fact, secured the payment of compensation." <u>Granus v. North Am. Philips Lighting Corp.</u>, 821 F.2d 1253, 1257 (6th Cir. 1987) (citing KRS § 342.690).

KRS § 342.610(2) provides in part as follows:

> A contractor who subcontracts all or any part of a contract and his or her carrier shall be liable for the payment of compensation to the employees of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured the payment of compensation as provided for in this chapter. . . . A person who contracts with another: . . .
> (b)      To have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of such person
>
> shall for the purposes of this section be deemed a contractor, and such other person a subcontractor. . . .

KRS § 342.610(2).

"The purpose of the provision of KRS 342.610 that a contractor is liable for compensation benefits to an employee [of] a subcontractor who does not secure compensation benefits is to prevent subcontracting to irresponsible people." <u>Fireman's Fund Ins. Co. v. Sherman & Fletcher</u>, 705 S.W.2d 459, 461 (Ky. 1986). By the same token, "if a defendant qualifies as a contractor, 'it has no liability in tort to an injured employee of a subcontractor' once worker's compensation benefits are secured." <u>Giles v. Ford Motor Co.</u>, 126 Fed. Appx. 293, 295 (6th Cir. April 4, 2005) (quoting <u>Fireman's Fund</u>, 705 S.W.2d at 461). Essentially, "the Act treats the employees of a subcontractor as *de jure* employees of the contractor for the purposes of guaranteeing worker's compensation benefits." <u>Giles</u>, 126 Fed. Appx. at 295.

The issue presented here is whether the work being performed by McCarty, as an employee of Evansville Garage Doors, was a "regular or recurrent" part of Covol's business under KRS § 342.610(2)(b). Prior courts examining this particular issue have gone to some length to interpret "regular" and "recurrent" within the statute. <u>See</u> <u>e.g.</u>, <u>General Elec. Co. v. Cain</u>, 236 S.W.3d 579, 588 (Ky. 2007). However, the Defendant does not engage in an in-depth

analysis of these facts. Instead, Defendant relies solely on a perceived admission within the Plaintiffs' original motion for partial summary judgment. Specifically, Defendant seems to focus on the paragraph that states as follows:

> Here, Covol has *repeatedly* maintained that constructing post frame buildings is both an integral and recurring part of its business operations. So, pursuant to KRS 338.031, Covol owed a duty to McCarty to maintain a safe workplace free of hazards, such as the defective stepladder McCarty was on at the time he fell.

(Mem. in Supp. of Pls.' Mot. for Partial Summ. J., DN 113-1, at 23). From this particular section, Defendant concludes, "The plaintiff argues that KRS 338.031 applies to Covol. As a matter of logic, the plaintiff seems to be conceding the regular-or-recurrent factor. If so, the plaintiff's action is barred by the exclusive-remedy rule."[1] (Covol's Mem. in Supp. of Mot. for Summ. J., DN 120-1, at 38).

The Court does not agree with the Defendant's contention that the Plaintiff has conceded the "regular-or-recurrent" issue. Instead, the Court finds that the Plaintiffs simply used Defendant's admissions in discovery documents regarding "regular or recurrent" work to support Plaintiffs' argument for a violation of state and federal mining regulations under the "regular job site" requirement for OSHA and KOSHA violations. The two are completely different issues.

Other than Plaintiffs' alleged concession, Covol fails to assert any facts that would support that McCarty's work constituted "regular or recurrent" for Covol. The Defendant has the burden of demonstrating why the exclusive remedy applies in this case. General Elec. Co. v. Cain, 236 S.W.3d 579, 585 (Ky. 2007) ("[A] premises owner who asserts exclusive remedy immunity must both plead and prove the affirmative defense."). Defendant's sole reliance on Plaintiffs' ambiguous statement is not sufficient to meet its burden for this affirmative defense.

---

[1] Covol maintained in its reply to Plaintiffs' response that it "interpreted McCarty's summary-judgment memorandum as conceding the regular-or-recurrent issue." (Covol's Reply in Supp. of Mot. for Summ. J., DN 139, at 25).

Thus, Defendant's motion for summary judgment based on the exclusive remedy under the Workers Compensation Act cannot be granted.

## B. Premises Owner's Common Law Duty

Plaintiffs next argue that Defendant breached its common law duty of care for McCarty by not warning him of the unsafe condition of the ladder, the condition of the safety harnesses, and not training McCarty on fall protection for the post-frame building. Defendant does not dispute that it owed a common law duty to warn McCarty of latent dangers, but Defendant contends that any unsafe condition McCarty faced, if any at all, would be considered obvious to him. Thus, Defendant did not breach any common law duty to warn McCarty.

The parties do not dispute that Covol, as a premises owner, owed McCarty, an invitee, "a general duty to exercise ordinary care to keep the premises in a reasonably safe condition and to warn [McCarty] of dangers that are latent, unknown, or not obvious." West v. KKI, LLC, 300 S.W.3d 184, 191 (Ky. Ct. App. 2008) (citing Lewis v. B & R Corp., 56 S.W.3d 432, 438 (Ky. Ct. App. 2001)). Furthermore, Kentucky requires actual, rather than constructive, knowledge of a latent defect by a premises owner in order to establish a duty to warn or take steps to protect an independent contractor and its employees. Brewster v. Colgate-Palmolive Co., 279 S.W.3d 142, 148 (Ky. 2009).

Plaintiffs contend that Defendant should be liable for failing to warn McCarty specifically about "the condition of the ladder, the condition of the lanyard and harness, and the lack of training on the particular fall protection system McCarty had on while in the post frame building." (Pls.' Resp. in Opp'n to Covol's Mot. for Summ. J., DN 129, at 19). As to the condition of the harness, Plaintiffs do not allege that the safety harness was unsafe or defective in any manner, and in fact, it is undisputed that McCarty was not using the safety harness to tie-off

at the time he fell. (Dep. of Jeremy Means, DN 120-10, at 99).   Additionally, Plaintiffs'

argument concerning Covol's failure to train McCarty on fall prevention either relates more

closely to Plaintiffs' theory of duty under Covol's internal policies, see infra Part D, or they are

attempting to suggest Covol should have warned about the dangers of not tying-off when

working on a ladder.   In the case of the latter theory, McCarty, an individual trained and

experienced in installing garage doors, certainly did not need to be warned of the risks associated

with climbing a ladder.   Thus, neither the failure to warn of falling off of a ladder nor the failure

to train McCarty on the use of the safety harness creates a plausible claim under common law

premises liability.

As to the condition of the ladder, Plaintiff relies on a citation issued approximately a

month after McCarty's fall on March 26, 2009 that describes the ladder as having a stress crack

in the legs, one of the locking devices being broken, and some worn treads. (Mine Citation, DN

118-17, at 1).   This citation only indicates the condition of the ladder after the incident.   To

oppose Plaintiffs' contention, Defendant offers the independent evaluation by William Barnwell,

the MSHA inspector for incident, who concluded that McCarty fell due to the position of the

ladder, the lack of restraint on the door, and McCarty's deviation from the installation

instructions for the door. (MSHA report, DN 51-1, at 11).   Additionally, Defendant provides

expert testimony by Dr. John Wiechel who concluded that the condition of the ladder could not

have contributed to the fall.   Notwithstanding the strength of Defendant's evidence in opposition,

summary judgment is warranted here because the Plaintiffs have failed to meet the threshold of

demonstrating that Covol had any *actual* knowledge of the condition of the ladder prior to the

incident.   Brewster, 279 S.W.3d at 148 ("[O]ur precedent clearly establishes that actual—rather

than constructive—knowledge of a hidden danger is required to establish a duty for a landowner

to warn or take steps to protect an independent contractor and its employees."). Warren Teague, the superintendent of the facility, stated that he did not inspect the ladder prior to its use by McCarty. (Dep. of Warren Teague, DN 117-15, at 44). In fact, the ladder belonged to H & B Builders, not Covol. (Dep. of Mark Keller, DN 136-4, at 29). The Plaintiffs have failed to present any fact or point to any document that would suggest Defendant had any actual knowledge of a defect in the ladder prior to McCarty's fall. By allowing the Plaintiffs to avoid summary judgment by not providing facts to suggest actual knowledge of any latent defect in the ladder, the Court would be effectively shifting the burden to the Defendant to show that it was not negligent. Brewster, 279 S.W.3d at 149-50 (rejecting the burden shifting approach adopted in Lanier v. Wal-Mart Stores, Inc., 99 S.W.3d 431 (Ky. 2003) that imposed a rebuttable presumption of negligence on the "business owner") (citing Lanier, 99 S.W.3d at 437). As a result, Covol's motion on summary judgment for this issue is **GRANTED**.

### C. Negligence *Per Se*

Under a theory of negligence *per se*, Plaintiffs contend that Covol is liable for violating state and federal mining regulations. Plaintiffs rely on KRS § 446.070 that provides a cause of action for persons injured due to the violation of penal or forfeiture statute. In response, Defendant argues that Plaintiffs' negligence *per se* theory fails because McCarty neither belonged to the class of persons meant to be protected by mining statutes nor did the accident result from the type of incident that the statutes are meant to prevent.

Negligence *per se* "is merely a negligence claim with a statutory standard of care substituted for the common law standard of care." Real Estate Mktg., Inc. v. Franz, 885 S.W.2d 921, 926–27 (Ky. 1994) (citation omitted). "[It] provides an avenue by which a damaged party may sue for a violation of a statutory standard of care if the statute in question provides no

inclusive civil remedy and if the party is within the class of persons the statute is intended to protect." Young v. Carran, 289 S.W.3d 586, 589 (Ky. Ct. App. 2008) (citing Hargis v. Baize, 168 S.W.3d 36, 40 (Ky. 2005)). Kentucky codified the common-law doctrine of negligence *per se* in K.R. S. § 466.070, which states that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." However, a plaintiff may not simply rely on a statutory violation for negligence *per se*, as explained in the following section:

> [T]he mere violation of a statute does not necessarily create liability unless the statute was specifically intended to prevent the type of occurrence which has taken place. Not all statutory violations result in liability for that violation. The violation must be a substantial factor in causing the injury and the violation must be one intended to prevent the specific type of occurrence before liability can attach.

Lewis v. B & R Corporation, 56 S.W.3d 432, 438 (Ky. Ct. App. 2001).

Defendant contends that there is no need to even discuss violations of state and federal mining regulations under Plaintiffs' theory of negligence *per se* without the Plaintiff first showing an independent basis for a duty owed to McCarty. Defendant's argument arises from language in Ellis v. Chase Communications, Inc., 63 F.3d 473, 478 (6th Cir. 1995) where the court found that the plaintiff could not simply rely on OSHA violations to establish an independent duty of care because the regulations "can never create a private right of action," and they "can never provide a basis for liability." Id. Defendant is correct in stating that Plaintiff may not base a claim on a federal MSHA violation because KRS § 446.070 clearly only applies to violations of Kentucky regulations. Young v. Carran, 289 S.W.3d 586, 589 (Ky. Ct. App. 2008) (citing T & M Jewelry, Inc. v. Hicks ex rel. Hicks, 189 S.W.3d 526, 530 (Ky. 2006)) ("Kentucky courts have held that the 'any statute' language in KRS 446.070 is limited to Kentucky statutes and does not extend to federal statutes and regulations or local ordinances.").

However, as for a violation of a Kentucky regulation, the Kentucky Supreme Court in <u>Hargis v.</u> <u>Baize</u>, 168 S.W.3d 36, 45 (Ky. 2005) explained, much as the court did in <u>Ellis,</u> that a violation of KOSHA is actionable "if the right of action arises from a source created separately from and independently of KOSHA." <u>Hargis</u>, 168 S.W.3d at 45 (citing <u>Ellis</u>, 63 F.3d at 478). At that point, the court diverged from the holding in <u>Ellis</u> by explaining that KRS § 446.070 actually creates the independent basis for a private cause of action as long as the plaintiff "is within the class intended to be protected" by a violation of the statute. <u>Hargis</u>, 168 S.W.3d at 45. Thus, to assert a cause of action under KRS § 446.070, Plaintiffs must meet a three-part test: (1) McCarty had to be within the intended class to be protected by Kentucky's mining safety regulations, (2) "the statute must have been specifically intended to prevent the type of occurrence that took place, and [(3)] the violation must have been a substantial factor in causing the results." <u>Hargis</u>, 168 S.W.3d at 46 (citing <u>Isaacs v. Smith</u>, 5 S.W.3d 500, 502 (Ky. 1999)).

The first threshold for the Plaintiffs is to demonstrate that McCarty was within the intended class to be protected by Kentucky's mining safety regulations. While Kentucky courts have significantly explored the contours of the intended class for OSHA or KOSHA violations, the intended class for Kentucky mining violations is an issue of first impression. When faced with "an undecided question of Kentucky law, a federal court sitting in diversity must make the 'the best prediction, even in the absence of direct state precedent, of what the Kentucky Supreme court would do if it were confronted with [the] question.'" <u>Combs v. International Ins. Co.</u>, 354 F.3d 568, 577 (6th Cir. 2004) (quoting <u>Managed Health Care Assocs., Inc.v. Kethan</u>, 209 F.3d 923, 927 (6th Cir. 2000)). As such, the Court "'must proceed with caution' when making pronouncements about state law." <u>Id</u>. (quoting <u>Lexington Insurance Co. v. Rugg & Kopp, Inc.</u>, 165 F.3d 1087, 1090 (7th Cir. 1999)). Although this is an issue of first impression, <u>Hargis</u>

provides guidance in determining what Kentucky may consider paramount in determining whether an independent contractor working on a building at a mine would be considered within the class of persons meant to be protected under Kentucky mining regulations. On making a determination of what persons belonged to the class meant to be protected under KOSHA, Hargis focused primarily on the legislative intent from the statute. Hargis, quoting directly from Teal v. E.I. Dupont de Nemours and Co., 728 F.2d 799 (6th Cir. 1984), concluded:

> We believe that Congress [the General Assembly] enacted Sec. 654(a)(2) [KRS 338.031(1)(b)] for the special benefit of *all* employees, including the employees of an independent contractor, who perform work at another employer's workplace. The specific duty clause represents the *primary* means for furthering Congress' purpose of assuring 'so far as possible every working man and woman in the Nation safe and healthful working conditions.' 29 U.S.C. Sec. 651(b). The broad remedial nature of the Occupational Health and Safety Act of 1970 is the Act's primary characteristic.

Hargis, 168 S.W.3d at 44 (quoting Teal, 728 F.2d at 804).

Thus, the question here is whether Kentucky's mining regulations express the same broad inclusive coverage of individuals as found in KOSHA. Fortunately, in the case of Kentucky mining regulations, the General Assembly codified its findings within Chapter 351, which governs the Kentucky Department of Natural Resources and contains the regulatory authority for the Office of Mine Safety and Licensing. In this chapter, the General Assembly made clear that "[t]he highest priority and concern of the Commonwealth must be the health and safety of the coal industry's most valuable resource, the miner." KRS § 351.101.[2] While Chapter 351 does not define "miner," 30 U.S.C. § 802(g) defines "miner" as "any individual working in a coal or other mine." Kentucky defines a "mine" as "any open pit or any underground workings from which coal is produced for sale, exchange, or commercial use, and all shafts, slopes, drifts, or inclines leading thereto, and includes all buildings and equipment, above or below, the surface of

---

[2] KRS § 351.101 tracks very closely Congressional findings contained within the chapter governing MSHA. 30 U.S.C. § 801.

the ground, used in connection with the workings." KRS § 351.010. Even though the common use of the word "miner" conjures an image of a person working underground, the definition of "mine" includes a broader area of coverage for persons to be considered "miners" because "mines" include both facilities below and above the surface that are "used in the connection with the workings." Id. However, under these facts, it would be difficult to consider McCarty as part of the group of persons meant to be protected by Kentucky's mining statutes and regulations. McCarty was an employee of a subcontractor that was hired to install a garage door on a building not actually being utilized by Covol yet. Even under an expansive definition of "mine," it still does not include an unfinished building that is not yet related to the workings of the facility.

Although Kentucky has not addressed the issue of whether state mining regulations cover independent contractors working at a mining facility, the Wyoming Supreme Court addressed this particular question in Burnett v. Imerys Marble, Inc., 116 P.3d 460 (Wyo. 2005). Burnett, a truck driver for an independent contractor, injured himself while "tarping" materials picked up from the Imerys' warehouse. Id. at 461. The warehouse, located approximately 17 miles from the carbonate mine, stored product for the truck drivers to load into their vehicles. Id. After loading his truck, Burnett moved his vehicle into the field across from the warehouse in order to tarp the load. Id. While tarping the product, Burnett fell from the truck, and he sued Imerys based on the theory that it breached a duty of care for failing to follow MSHA regulations.[3] Id. In reviewing the Congressional findings as to the purpose of MSHA regulation, the Wyoming Supreme Court stated as follows:

> [W]e must conclude that Burnett is not among the class of persons the Mine Act is intended to protect. First, Burnett is not a miner because he is not an individual working in a mine. While the definition of "mine" is broad enough to include milling facilities such as Imerys' processing facility, it is clear that Burnett does

---

[3] MSHA cited Imerys for violation of 30 C.F.R. § 56.15005 (2004), which is also a section that Plaintiffs in this case contend that Defendant violated. (Mem. in Supp. of Pls.' Mot. for Partial Summ. J.,DN 113-1, at 13).

> not work in that facility and is not allowed in that facility when tarping his load. Burnett does get his truck loaded at the warehouse but no processing takes place at the warehouse. Furthermore, Burnett was not even at the warehouse when the accident occurred. Instead, he was in an open field across from the warehouse. Burnett is not a miner. He is a commercial truck driver who occasionally transports products produced in a mine.

Id. at 464-65. Here, McCarty's work with the installation of the garage door was less involved with the mining process than even Burnett's hauling of material from the warehouse.

Even assuming *arguendo* that McCarty fell within this protected class, it is extremely unlikely that he was injured in a way that the statutes and regulations were meant to prevent. Plaintiffs reference Kentucky Administrative Regulations, requiring "Hazard Training," 805 KAR 7:090, or placing restrictions on employees working in "hazardous conditions," 80115 KAR 3:020, to suggest that McCarty's injury was the type the statutes are meant to prevent. (Pls.' Resp. in Opp'n to Covol's Mot. for Summ. J., DN 129, at 17-18). However, Kentucky mining regulations define "Hazard training" as "instruction in awareness and avoidance of accident or injury from *conditions inherent to mining* provided by the licensee to visitors exposed to mine hazards." 805 KAR 7:010(6) (emphasis added). McCarty's fall off the ladder was not an injury "inherent to mining" despite the fact that it happened at a mine site. The Wyoming Supreme Court similarly concluded:

> [T]he hazard that Burnett encountered was not a mining hazard but a hazard of his job as a commercial trucker. Indeed, Burnett acknowledged that tarping was a normal part of his job as a trucker. He tarped approximately ninety percent of his loads, many of which are in no way related to Imerys or other mining operations. Thus, Burnett's accident was not a product of the hazard the Mine Act was intended to protect against.

Burnett, 116 P.3d at 464. Similarly, the hazard that McCarty faced was not a hazard inherent to mining but a hazard related to the installation of garage doors.

Since McCarty does not fall within the class of persons meant to be protected by state mining regulations nor injured by the type of hazards the regulations are meant to prevent, he may not pursue an action under KRS § 466.070.

### D. Assumption of a Duty of Care

Plaintiffs assert three theories under which they allege Covol assumed a duty of care for McCarty. First, Plaintiffs claim Covol created and owed a duty of care to McCarty based on its lease with Kentucky to mine coal. The second and third theories are fairly intertwined because Plaintiffs argue that Covol assumed a duty of care based on its own internal policies and "affirmative steps to enforce its safety policies and procedures to employees of independent contractors." (Mem. in Supp. of Pls.' Mot. for Partial Summ. J., DN 113-1, at 19-20). Under these two theories, Plaintiffs contend that the Defendant may be held liable if it established an internal policy, and then subsequently failed to follow that policy. In support of this argument, Plaintiffs rely on the Restatement of Torts (Second) §§ 323, 324A (1965) to establish liability based on a theory that Covol voluntarily assumed a duty of care for McCarty. In response, Covol contends that McCarty cannot be a third-beneficiary to Covol's contract with Kentucky because the lease does not require Covol to render any services to McCarty. As to Plaintiffs second and third theory, Covol argues that Plaintiffs' claim fails as a matter of law because Kentucky does not impose a duty on companies based on their internal policies and that Sections 323 and 324A do not apply under these facts.

### 1. Covol's Lease with Kentucky

Plaintiffs assert that Covol's lease with Kentucky made McCarty an intended third-party beneficiary of the agreement, and as such, Covol assumed a duty of care for McCarty. To establish liability, Plaintiffs rely on both <u>Presnell Construction Managers, Inc. v. EH</u>

Construction, LLC, 134 S.W.3d 575 (Ky. 2004) and the Restatement (Second) of Torts § 324A (1965). Presnell establishes that "[o]nly a third-party who was intended by the parties to benefit from the contract, namely, a donee or a creditor beneficiary, has standing to sue on a contract; an incidental beneficiary does not acquire such right." Id. at 579 (citation omitted). Clearly, McCarty cannot be considered a donee beneficiary as that would involve a gift. Sexton v. Taylor Cnty., 692 S.W.2d 808, 809 (Ky. Ct. App. 1985). To be a creditor beneficiary, McCarty would need to show "that the contract in question was made for the actual and direct benefit of [McCarty]." Id. The Plaintiffs' claim under this theory lacks merit because Covol's lease with Kentucky deals with mining coal, not providing services or protection to McCarty. Moreover, Plaintiffs fail to reference or point to any part of Covol's lease that would suggest that McCarty was an intended beneficiary of it.

Plaintiffs also argue that Section 324A of the Restatement (Second) of Torts supports a finding that Covol assumed a duty to McCarty under its lease with the Commonwealth. In Ostendorf v. Clark Equipment Co., 122 S.W.3d 530, 538-39 (Ky. 2003), Kentucky adopted Restatement (Second) of Torts § 324A (1965), which provides the elements to establish liability for a voluntarily assumed duty. The relevant section states as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965). Plaintiffs argue that "Covol contractually agreed to adhere to the Federal and State regulations and statutes which required Covol to take a number of safety precautions as delineated previously in this memorandum." (Mem. in Supp. of Pls.' Mot. for Partial Summ. J., DN 113-1, at 21-22). Plaintiffs" reliance on Section 324A of the Restatement (Second) of Torts is misplaced. Notwithstanding Covol's agreement to adhere to the law, Covol did not render services to the Commonwealth of Kentucky which it should recognize as necessary for the protection of McCarty.

## 2. Covol's Internal Policies

Plaintiffs' final two theories, under an assumed duty claim, rely on Covol's internal policies and its subsequent failure to follow those policies. Similar to Plaintiffs' claim based on Covol's lease with Kentucky, Plaintiffs utilize Sections 324A and 323 of the Restatement (Second) of Torts to establish a claim against Defendant. Covol answers by arguing that internal policies of a company cannot be the basis of liability, and that Sections 324A and 323 do not apply under these set of facts.

Kentucky rejects the notion that "a person or business entity's adoption of an internal guideline or policy and subsequent failure to follow that internal guideline automatically leads to liability under § 324A." Morgan v. Scott, 291 S.W.3d 622 (Ky. 2009). Simultaneously, this does not necessarily foreclose liability in situations where a defendant's actions fall within Sections 324A or 323. Defendants rely on Morgan to show that Covol cannot be liable to McCarty for both the internal policy theory and the claim based on Sections 324A and 323. Plaintiffs are correct in noting that the facts of this case are "distinguishable" from those found in Morgan; however, the factual distinctions are exactly what make Section 324A inapplicable to Plaintiffs' claim against Defendant. Section 324A places liability for the injuries to a third person on the

party who renders services to another party.  Restatement (Second) of Torts § 324A (1965).  An example in the comment section demonstrates this point as follows:

> A operates a grocery store. An electric light hanging over one of the aisles of the store becomes defective, and A calls B Electric Company to repair it. B Company sends a workman, who repairs the light, but leaves the fixture so insecurely attached that it falls upon and injures C, a customer in the store who is walking down the aisle. B Company is subject to liability to C.

Restatement (Second) of Torts § 324A cmt. c (1965).  This illustration identifies the obvious flaw in Plaintiffs' argument; McCarty was the party rendering services, not Covol.  As a result, Plaintiffs may not rely on Section 324A to establish a theory of liability for Covol.

In addition to an argument based on Section 324A, Plaintiffs also contend that Defendant made certain promises to McCarty to provide necessary equipment and training in order to complete the work with the garage door.  Thus, according to Plaintiffs, Covol rendered services to McCarty, which means it may be liable under Section 323.  The relevant section states as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking

Restatement (Second) of Torts § 323 (1965).  Again, the Court struggles to find any fact that would suggest that Covol would be considered "rendering services" to McCarty.  Even if Covol's promise to provide safety equipment met the first part of the test under Section 323, Plaintiffs claim still fails to meet either (a) or (b).  Since Covol never rendered any extra training to McCarty, it would be impossible for them to have failed exercise reasonable care which would have increased the risk of harm to McCarty under Section 323(a).  Additionally, if the "services"

were the safety policies, it would similarly be impossible for Plaintiffs to argue that McCarty relied on them because he started working on the garage door without the equipment or the training. In other words, McCarty could not have relied on something to his detriment when he knew that he had not received extra training or equipment. As such, Plaintiffs cannot rely on these theories to assert a claim against Defendant.

### E. Plaintiffs' Motion for Sanctions [DN 114]

Plaintiffs seek to have the Court enter partial summary judgment against Defendant as a sanction for spoliation of evidence. Specifically, Plaintiffs focus on the destruction or absence of the ladder, Covol's sign-in sheets for the training center the day McCarty fell, McCarty's harness and lanyard, and cell phones used by Mark Keller, Warren Teague and Merrylynne Preston.[4] Defendant responds by arguing that sanctions should not be imposed because either the piece of evidence lacks relevance or the Plaintiffs have obtained an adequate alternative to that evidence.

In federal courts, the issue of spoliation is controlled by federal law. Adkins v. Wolever, 554 F.3d 650, 652 (6th Cir. 2009) (en banc). "Spoliation is defined as the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction." United States v. Copeland, 321 F.3d 582, 597 (6th Cir. 2003) (citation omitted). It applies when a party has a duty to preserve the evidence. "[I]t is beyond question that a party to civil litigation has a duty to preserve relevant information . . . when that party 'has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation.'" John B. v. Goetz, 531 F.3d 448, 459 (6th Cir. 2008) (quotation omitted). It is the responsibility of the parties to ensure that relevant information "is preserved, and when that duty is breached, a district court may exercise its authority to impose appropriate discovery sanctions." Id. (citation omitted).

---

[4] The Court notes that Plaintiffs also included several other items later in the motion.

"[A] proper spoliation sanction should serve both fairness and punitive functions." <u>Adkins</u>, 554 F.3d at 652 (citation omitted).  And before the Court may sanction a party for losing or destroying evidence, it must consider the party's fault, which generally falls "along a continuum . . . ranging from innocence through the degrees of negligence to intentionality[.]" <u>Id</u>. at 652–653 (quoting <u>Welsh</u>, 844 F.2d at 1246).  "[A] district court could impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence." <u>Beaven v. U.S. Dept. of Justice</u>, 622 F.3d 540, 554 (6th Cir. 2010) (quoting <u>Adkins</u> 554 F.3d at 653)). Parties seeking a court to take action based on spoliation must generally establish three elements:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

<u>Id</u>. at 553. The usual sanction for spoliation of evidence is an adverse inference instruction to the jury which generally requires bad faith. <u>In re Nat'l Century Fin. Enters., Inc.</u>, No. 2:03–md–1565, 2009 WL 2169174, at *3 (S.D. Ohio July 16, 2009) (citation omitted). However, ordinary negligence may suffice to warrant an adverse inference instruction "if that is necessary to further the remedial purpose of the inference." <u>BancorpSouth Bank v. Herter</u>, 643 F.Supp.2d 1041, 1061 (W.D. Tenn. 2009) (quoting <u>Residential Funding Corp. v. DeGeorge Fin. Corp.</u>, 306 F.3d 99, 108 (2d Cir. 2002) ("The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence.")).

The Plaintiffs ask that the Court to order summary judgment in their favor as to liability against Defendant Covol, or in the alternative, they seek an adverse inference instruction as well as the exclusion of Dr. Wiechel's expert testimony. Defendant responds that it should not receive any sanction for spoliation, but if the Court were to impose one, then at the very most, the Plaintiff should only be entitled to an adverse inference instruction. In this case, neither party disputes that the Defendant both had a duty to preserve all relevant evidence to this case and that it had a retention policy that stated that fact as well. As to the second element, "a culpable state of mind," the Defendant at least negligently disposed of some evidence, but it does not seem that its actions rose to the level of bad faith. However, even if Defendant breached its duty to retain certain pieces of evidence in this case, Plaintiffs have failed to show how anyone of these items could establish particular relevance to a claim. As previously discussed, the only potentially viable claim for Plaintiffs would be one under premises liability. Under that theory, Plaintiffs' claim failed because they were unable to show that Defendant had actual knowledge of a latent defect in the ladder that would have triggered a duty to warn McCarty. Based on the items listed in Plaintiffs' motion for sanctions, Plaintiffs have failed to show how any of this evidence would be able to establish a factual question concerning actual knowledge of a defect in the ladder. Thus, there is no reason to impose any sanctions on Defendant. For that reason, the Plaintiffs' motion for sanctions is **DENIED**.

### IV. CONCLUSION

For the foregoing reasons, Defendant Covol's Motion for Summary Judgment is **GRANTED** [DN 120] and Plaintiffs' Motion for Partial Summary Judgment is **DENIED** [DN 113]. Since Liberty Mutual Agency Market's, the Intervening Plaintiff, claim is contingent on a finding of liability against Covol, it is also **DISMISSED**.

Additionally, Plaintiffs' *Daubert* Motion to Exclude Testimony and Opinions of Dr. George R. Nichols [DN 115], Plaintiffs' Motion *In Limine* Excluding Any Reference at Trial to David McCarty's Alleged Marijuana Use [DN 116], and Defendant's Motion to Exclude, or Limit Testimony of, Plaintiff's Expert Witnesses [DN 122] are **DENIED** as **MOOT**. Finally, Plaintiffs' Motion for Sanctions is **DENIED** [DN 114].

cc: counsel of record

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

October 15, 2013